# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 28, 2025

Lyle W. Cayce
Clerk

No. 23-40543

---

RAFAEL TINOCO,

*Plaintiff—Appellant*,

*versus*

CITY OF HIDALGO, TEXAS; SERGIO CORONADO, *in his individual and official capacity*; ROMEO RODRIGUEZ, *in his individual and official capacity*; RAUL CANTU, *in his individual capacity and official capacity*; ESTEBAN LOZANO, *in his individual capacity and official capacity*; GUADALUPE AMAYA,

*Defendants—Appellees*.

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 7:23-CV-136

---

Before HIGGINBOTHAM, STEWART, and HAYNES, *Circuit Judges*.

PER CURIAM:[*]

Rafael Tinoco brought this lawsuit under 42 U.S.C. § 1983 against the City of Hidalgo, its mayor, its police chief, and two officers of the Hidalgo Police Department (collectively, the "City"). Tinoco alleges that the City

---

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

No. 23-40543

violated his Fourth and Fourteenth Amendment rights by wrongfully arresting him on charges of witness tampering and by interrogating him afterward. Tinoco also brought state law claims for defamation and slander against Guadalupe Amaya for providing the police with information that led to his arrest. The district court dismissed each of Tinoco's claims. Thereafter, Tinoco appealed. Because we agree that Tinoco failed to state a claim for a violation of his constitutional rights, we AFFIRM the district court's judgment.

## I.

### A. Factual Background

Rafael Tinoco was the principal of Hidalgo Early College High School, which is located in Hidalgo, Texas.[1] As principal, one of Tinoco's responsibilities was to investigate matters involving teachers, staff, and students at the school. On February 28, 2023, the school's soccer team refused to play a game scheduled for that day to protest the school reassigning Ezequiel Morales, the team's prior coach. As a result of the protest, the team held a locker room meeting where Monty Stumbaugh, Athletic Director of Hidalgo Independent School District, is alleged to have used profanity, made threats, and assaulted a student-athlete.

On March 1, 2023, Tinoco was informed about the locker room altercation and began collecting statements from students on the soccer team regarding the incident. As he was leaving the school that day, Amaya—assistant coach for the school's soccer team—called Tinoco to

_____

[1] Because this appeal involves review of a motion to dismiss under Federal Rule of Civil Procedure 12(b), the facts presented herein are as alleged by Tinoco. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.").

discuss what he had observed during the altercation. Tinoco asked him to produce a written statement.[2] The next day, Amaya provided his written statement to Tinoco. Tinoco then learned from one of the school's resource officers that a parent filed a complaint of assault against Stumbaugh with the Hidalgo Police Department. Tinoco told that resource officer that he had "collected statements concerning another matter and would share those statements with [the police department] after he reviewed the statements."[3] The next day, Tinoco directed Amaya to come to his office, where he asked Amaya if he saw Stumbaugh grab or touch any of the students in the locker room, to which Amaya responded, "no." Tinoco then directed Amaya to produce a second written statement that included this information, which Amaya submitted to Tinoco the next day.

On March 22, 2023, police officers Raul Cantu and Esteban Lozano came to the school and requested to meet with Tinoco. The officers asked Tinoco to stop by the police station and provide a statement on an ongoing investigation. Tinoco went to the station that day, but the officers were unavailable when he arrived. The receptionist told Tinoco that the officers would call him later so he left the police station.

Over the next few days, Tinoco alleges that he had two "bizarre and puzzling" encounters with school staff members. First, Morales visited Tinoco in his office and asked Tinoco to accompany him back to his classroom. Morales made sure that both of their phones were left in Tinoco's office. Once they were inside Morales's classroom, Morales began "talking through his teeth," writing on several pieces of paper, showing them to

_____

[2] Due to Amaya's limited English, Tinoco told Amaya that the statement could be written in Spanish.

[3] Tinoco does not clarify what he meant by "another matter" in this section of his amended complaint.

Tinoco, and then putting them in his pocket. Morales used this method to communicate statements to the effect of "it's going down," "they are looking out for themselves," "they are not going to help you," "you are on your own," "just tell them who told you to do it and they will leave you alone," and "tell them the order came from upstairs." Tinoco then left Morales's classroom, stating that he did not know what Morales was talking about.

During the second encounter, another staff member, Nancy Cavazos, stopped by Tinoco's office and made similar statements to those that Morales had made. Eventually, Cavazos told Tinoco that "there is a coach that said you told him to change his story," and that "when they ask you just tell them, who told you to do that." Tinoco responded by telling Cavazos that he did not ask anyone to change their story.

Later that afternoon, Tinoco was notified by security that members of the media wanted to enter campus. Tinoco alleges that the media was tipped off that he was going to be arrested in order to pressure, intimidate, and humiliate him. An hour after the media arrived, Officers Cantu and Lozano came to the school and stated that they had a warrant for Tinoco's arrest for tampering with a witness. When Tinoco asked to view the warrant, the officers stated that they did not need to show it to him. Tinoco later learned that the warrant included a probable cause affidavit recounting a police interrogation of Amaya, in which he alleged that Tinoco told him that "he needed to change his statement by adding that Coach Esteban Alegria was present in the locker room at the time of the incident involving the assault of a student," but that Amaya refused to do so because that would be a lie.

After his arrest, Tinoco was taken to the police station and interrogated as to whether he pressured Amaya to change his testimony about the locker room altercation, which Tinoco denied. For some portion of the

interview, the camera on the ceiling was covered. Officer Lozano, however, video-recorded the interrogation with his cell phone.[4] Despite Tinoco's arrest and subsequent interrogation, his criminal charges were ultimately dismissed after a grand jury issued a "No Bill."

### B. Procedural History

On April 20, 2023, Tinoco brought suit under 42 U.S.C. § 1983 against the City. Tinoco also brought state law claims for slander and defamation against Amaya. The City moved to dismiss Tinoco's claims and then filed an answer. Tinoco subsequently filed an amended complaint, and the City moved to dismiss his claims in the amended complaint as well. Tinoco filed an opposition to the City's motion to dismiss, briefly requesting in the alternative that he be permitted to amend his complaint for a second time if the district court found his amended complaint insufficient.

The district court dismissed all of Tinoco's claims, reasoning that Tinoco failed to state a plausible claim for relief because: (1) the arrest warrant was supported by probable cause, (2) even if the officers violated Tinoco's rights, his claims against them are barred by qualified immunity, (3) the court did not need to assess whether Tinoco established municipal liability against the City of Hidalgo and its officials because Tinoco failed to plead a constitutional violation, and (4) it would be inappropriate to exercise supplemental jurisdiction over Tinoco's state law claims against Amaya with all of Tinoco's federal claims dismissed. In doing so, the district court declined to address Tinoco's perfunctory request to amend his complaint for the second time. Tinoco timely appealed.

---

[4] Tinoco alleges that other arrestees or witnesses have had similar recording procedures employed during their interrogations with the Hidalgo Police Department.

No. 23-40543

## II.

On appeal, Tinoco raises four arguments. First, he argues that the district court erred in dismissing his § 1983 claims against Officer Lozano and Officer Cantu. Second, he argues that the district court erred in dismissing his § 1983 claims against the City of Hidalgo, Mayor Coronado, and Chief Rodriguez. Third, he argues that the district court erred in dismissing his state law claims against Amaya. And fourth, he argues that the district court erred in rejecting his request to amend his amended complaint. We address each of these arguments in turn.

We review "a district court's ruling on a motion to dismiss de novo, accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs." *Dyer v. Houston*, 964 F.3d 374, 379 (5th Cir. 2020) (internal quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* To state a facially plausible claim for relief under 42 U.S.C. § 1983, a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law. *See James v. Tex. Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008).

We review a district court's decision to retain jurisdiction over state law claims for abuse of discretion. *Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 585 (5th Cir. 1992). We also review a district court's denial of a motion to amend a complaint for abuse of discretion. *See Marucci*

6

No. 23-40543

*Sports*, *L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014).

**III.**

*A. Tinoco's § 1983 Claims Against Officer Lozano and Officer Cantu*

*1. Fourth Amendment*

Tinoco first argues that the officers violated his Fourth Amendment rights because they lacked probable cause for his arrest. We disagree. As the record reveals, Tinoco's arrest was made pursuant to an arrest warrant accompanied by a probable cause affidavit. That probable cause affidavit stated the following:

> Investigator Esteban Lozano obtained a video affidavit from witness Guadalupe Amaya . . . in which he stated that on Friday, March 3, 2023 at or about 7:45 a.m., he was at work when Principal Rafael Tinoco sent him a phone text, asking him to go to his office. When he met with Principal Rafael Tinoco at his office, Principal Tinoco told him he needed to change his statement by adding that Coach Esteban Alegria was present in the locker room at the time of the incident involving the assault of a student. Coach Amaya refused to change his statement, and told Principal Tinoco he was not going to add that Coach Alegria was in the locker room at the time of the incident because it was a lie. Coach Amaya did not change the statement he had already turned in.
>
> . . . .
>
> Hidalgo Police Officers reviewed the preliminary report, [s]upplemental report, statements and evidence and determined that there was sufficient evidence to determine Rafael Tinoco did commit the offense [of] Tampering with [a] Witness.

Because Tinoco's arrest was carried out pursuant to an arrest warrant that a magistrate judge authorized, there was presumptively probable cause for his

7

arrest, and the officers who relied on the warrant are shielded from liability by the independent-intermediary doctrine. *Terwilliger v. Reyna*, 4 F.4th 270, 285 n.10 (5th Cir. 2021); *Malley v. Briggs*, 475 U.S. 335, 346 n.9 (1986). To attack that presumption and doctrine, Tinoco must plausibly allege (1) that the warrant affidavit facially failed to establish probable cause, *see Malley*, 475 U.S. 335, or (2) that intentional or reckless false statements in the affidavit resulted in the warrant lacking probable cause, *see Franks v. Delaware*, 438 U.S. 154 (1978).[5] He has failed to do so.

As to Officer Cantu, Tinoco failed to allege facts suggesting that he had anything to do with the preparation of the allegedly deficient or untruthful warrant affidavit. The probable cause affidavit shows that Officer Lozano was the sole affiant. Liability under *Malley* only attaches to the "affiant and person who actually prepared, or was fully responsible for the preparation of, the warrant application." *See Melton v. Phillips*, 875 F.3d 256, 264 (5th Cir. 2017) (quoting *Michalik v. Hermann*, 422 F.3d 252, 261 (5th Cir. 2005)). Thus, *Malley* does not apply here.

Separately, *Franks* liability extends to those who deliberately or recklessly provide false information for use in an affidavit. *Melton*, 875 F.3d at 264. Because the pleadings indicate that the warrant affidavit is based exclusively on information obtained by Officer Lozano, Officer Cantu cannot

---

[5] In evaluating the facial sufficiency of the warrant under *Malley*, the district court flipped the order of analysis. It first held that the warrant facially established probable cause and then held that even absent probable cause the independent-intermediary doctrine shielded Officer Lozano from liability. Because *Malley* deficiencies "overcome" the independent-intermediary doctrine, the district court should have first assessed whether the doctrine was applicable. Only then should it have evaluated the sufficiency of the warrant under *Malley*. *See Mayfield v. Currie*, 976 F.3d 482, 487 (5th Cir. 2020). Nonetheless, because the district court came to the correct conclusion at both stages of the analysis, its judgment must be affirmed.

be liable under *Franks* either. Thus, the district court did not err in dismissing Tinoco's Fourth Amendment claims against Officer Cantu.

As to Officer Lozano, Tinoco fails to plausibly allege under *Malley* that his arrest warrant application was "so lacking in indicia of probable cause as to render official belief in its existence unreasonable." 475 U.S. at 345. To evaluate whether there was probable cause for an arrest, this court first looks at the statute that the officers believed was violated. *See Bailey v. Iles*, 87 F.4th 275, 286 (5th Cir. 2023). Here, Tinoco was arrested for violating § 36.05 of the Texas Penal Code, which provides:

> (a) A person commits an offense if, with intent to influence the witness, he offers, confers, or agrees to confer any benefit on a witness or prospective witness in an official proceeding, or he coerces a witness or a prospective witness in an official proceeding:
>
> > (1) to testify falsely.
>
> . . . .

Tex. Penal Code § 36.05(a). Coercion is defined as "a threat, however communicated":

> (A) to commit an offense;
> (B) to inflict bodily injury in the future on the person threatened or another;
> (C) to accuse a person of any offense;
> (D) to expose a person to hatred, contempt, or ridicule;
> (E) to harm the credit or business repute of any person; or
> (F) to take or withhold action as a public servant, or to cause a public servant to take or withhold action.

Tex. Penal Code § 1.07(a)(9).[6]

---

[6] The Texas Penal Code does not explicitly define the term "coerces," as used in § 36.05, but it does define the term "[c]oercion." Tex. Penal Code § 1.07(a)(9). The

No. 23-40543

Here, Tinoco fails to plead facts that show that the arrest warrant was facially deficient. He argues that the affidavit does not show that he "coerced" Amaya to "testify" at an "official proceeding." While the elements of a statute are relevant to a probable cause determination, "[p]robable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams*, 407 U.S. 143, 149 (1972). An affidavit must merely present relevant "facts and circumstances" so that a judge can independently determine whether probable cause exists that a law was violated." *United States v. Satterwhite*, 980 F.2d 317, 321 (5th Cir. 1992).

The affidavit accompanying Tinoco's arrest warrant contained sufficient facts and circumstances to demonstrate probable cause. The affidavit outlines Amaya's police interrogation, where he stated that Tinoco called Amaya into his office and told him that "he *needed* to change his statement by adding that Coach Esteban Alegria was present in the locker room at the time of the incident involving the assault of a student." It depicts Amaya's belief that Tinoco wanted him to "lie" in his statement. Additionally, the affidavit explains that the police officers did not rely solely on Amaya's interrogation statements to establish probable cause but that they also reviewed other reports, statements, and evidence in the case before determining that there was enough evidence that Tinoco plausibly violated § 36.05(a). This is sufficient under our precedent. *See Kaley v. U.S.*, 571 U.S. 320, 338 (2014) ("Probable cause, we have often told litigants, is not a high bar.").

---

definition of "coercion" is applicable here because Texas Penal Code § 1.07(b) states that "[t]he definition of a term in this code applies to each grammatical variation of the term."

The affidavit contains facts from which it was at least probable that Tinoco violated § 36.05(a).[7] Given the facts outlined in the affidavit, it is not "conclusory" or "bare bones." *Satterwhite*, 980 F.2d at 321 (noting that "'[b]are bones' affidavits contain wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause"). Because the affidavit was not "so lacking in indicia of probable cause as to render official belief in its existence unreasonable," Tinoco has failed to state a Fourth Amendment violation under *Malley*, 475 U.S. at 345.

Similarly, Tinoco fails to plausibly allege under *Franks* that intentional or reckless false statements in the affidavit resulted in his arrest warrant lacking probable cause. *See* 438 U.S. 154. Tinoco does not identify "material

---

[7] To be sure, the affidavit does not explain precisely how Tinoco "coerced" Amaya. It also does not delineate whether the "official proceeding" was some part of the school's internal investigation or the police department's criminal investigation into the assault, or both. Counsel for the City argues that the plausibility of coercion is evident from the inherent power imbalance between Tinoco, a school principal, and Amaya, a subordinate staff member. Because this imbalance is discernible from the face the warrant affidavit, that argument has some force. It is not unreasonable to suspect that when a superior calls a subordinate into their office and instructs them to do something, that instruction carries with it an implicit threat of disciplinary action. Moreover, when the superior is a public servant, as is the case here, that implicit threat of discipline can constitute a threat to "take or withhold action as a public servant." *See* Tex. Penal Code § 1.07(a)(9)(F); *In re J.L. O.*, No. 03-01-00632-CV, 2002 WL 1804951, at *4 (Tex. App. Aug. 8, 2002) (unpublished) ("[T]eachers, school employees, police officers, [and] firefighters are defined by the penal code as public servants."). And in some circumstances, being disciplined by an employer can "expose a person to hatred, contempt, or ridicule." Tex. Penal Code § 1.07(a)(9)(F). But this court need not resolve whether any specific theory of coercion could convict Tinoco. Nor does this court need to decide precisely which events in this case fit within the Texas Penal Code's broad definition of an "official proceeding." *See* Tex. Penal Code § 1.07(a)(33) (defining an official proceeding as "any type of administrative, executive, legislative, or judicial proceeding that may be conducted before a public servant"). It is sufficient, for present purposes, that the warrant affidavit provides sufficient indicia of probable cause that Tinoco committed an offense.

misstatements or material omissions" in the warrant affidavit. *Terwilliger*, 4 F.4th at 281. Instead, he mischaracterizes the affidavit. He contends that "it clearly states that Coach Amaya witnessed an assault and that Tinoco wanted him to include another coach who was present when the assault took place." In reality, however, the affidavit explains that Amaya testified during his interrogation that those events occurred. In other words, Tinoco obfuscates the distinction between what the affidavit directly says occurred and what the affidavit says Amaya told the officers occurred.

In attempting to establish a material omission, Tinoco argues that the officers should not have relied on Amaya's interrogation testimony. That is because, in Tinoco's view, that testimony contradicted the written statements that Amaya submitted to Tinoco following the locker room meeting incident. As a result of those contradictions, Tinoco speculates that Amaya must have given false information to the police or that Officer Lozano must have fabricated probable cause. But Amaya's written statements do not refute the notion that Tinoco coerced Amaya to change his testimony—the core of Tinoco's witness tampering charge. Thus, there is no material contradiction between Amaya's written statements and his interrogation testimony. Even if such a contradiction exists, Tinoco fails to allege that the officers ever received or viewed Amaya's written statements prior to his arrest.

Tinoco also argues that the dates on the affidavit do not add up because they suggest that Tinoco committed the offense of witness tampering on February 28, 2023, but that Tinoco did not contact Amaya to change his statement about the locker room incident until March 3, 2023. But those alleged inaccuracies do not categorically preclude an affidavit from meeting the standard of probable cause. *See Kaley*, 571 U.S. at 338. Because Tinoco fails to allege material misstatements or material omissions that resulted in a warrant being issued without probable cause, the district court

did not err in dismissing his claims under *Franks. See Terwilliger*, 4 F.4th at 281.

At the core of Tinoco's claims under *Malley* and *Franks* is his belief that Amaya lied during his interrogation and that the evidence shows that Tinoco was truly innocent. But it is not enough for Tinoco to argue that he was innocent of the crime that he was arrested for because "innocent behavior frequently will provide the basis for a showing of probable cause." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983).[8] Tinoco's argument that there was insufficient evidence to establish each element of § 36.05(a) is similarly unpersuasive because, in assessing probable cause, it is not this court's task to determine whether a defendant could be convicted under the statute. *Brumfield v. Jones*, 849 F.2d 152, 155 (5th Cir. 1988) (acknowledging that "the standards for a determination of probable cause and for a criminal conviction markedly differ"). For these reasons, we hold that the district court did not err in ruling that Tinoco failed to state a claim under § 1983 against Officers Cantu and Lozano.

### 2. *Fourteenth Amendment*

On appeal, Tinoco argues that the district court erred in dismissing his § 1983 claim under the Fourteenth Amendment. In support, he argues that the district court erred by assuming that his Fourteenth Amendment claim stems from his arrest. He contends that it instead stems from Officer Lozano's conduct in filming the interrogation on a cell phone camera and in not allowing Tinoco to view his arrest warrant prior to his arrest. Again, we disagree.

---

[8] In *Gates*, "seemingly innocent activity became suspicious in the light of the initial tip." 462 U.S. at 243 n.13 (internal quotation marks and citation omitted).

In the first count of Tinoco's amended complaint he argued that his arrest violated his Fourteenth Amendment rights. As the district court acknowledged, however, an action brought under the Fourteenth Amendment "is inappropriate where a more specific constitutional provision provides the rights at issue." *Arnold v. Williams*, 979 F.3d 262, 270 (5th Cir. 2020) (citing *Albright v. Oliver*, 510 U.S. 266, 273 (1994)). And a claim for false arrest is rooted not in the Fourteenth Amendment, but rather in the Fourth Amendment's right to be free from unreasonable seizures. *See Nieves v. Bartlett*, 587 U.S. 391, 414 (2019) (Gorsuch, J., concurring) ("The common law tort of false arrest translates more or less into a Fourth Amendment claim."). Thus, Tinoco should have brought this claim under the Fourth Amendment, not the Fourteenth Amendment.

Even if Tinoco's Fourteenth Amendment claim were not about his arrest, it would still fail. Tinoco argues, without citing a single case, that the officers' refusal to show him his arrest warrant and their decision to record his interrogation on a cell phone camera were violations of his constitutional right to procedural due process. But Tinoco neglected to allege facts sufficient to establish a due process violation under the Fourteenth Amendment. "The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who would seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Procedural due process claims are subject to a two-step inquiry. "The first question asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Meza v. Livingston*, 607 F.3d 392, 399 (5th Cir. 2010) (internal quotation marks omitted). Liberty interests come from two potential sources: (1) "the Constitution itself, by reason of guarantees implicit in the word

No. 23-40543

'liberty'"; or (2) "an expectation or interest created by state laws or policies." *Wilkinson*, 545 U.S. at 221.

Tinoco's amended complaint does not allege that a property or liberty interest is at stake in this case. Only on appeal does he perfunctorily assert, without legal analysis or support, that his "liberty" interests were infringed because he did not get to see his warrant before he was arrested and because his interrogation was recorded on a cell phone camera. But Tinoco provides no legal authority that supports that he had a liberty interest in viewing his warrant before his arrest. To the contrary, the Texas Code of Criminal Procedure states that an officer "need not have the warrant in his possession at the time of the arrest."[9] Tex. Code Crim. Proc. art. 15.26.

Similarly, Tinoco provides no authority that supports that he had a liberty interest in having his interrogation recorded with a specific type of camera. Instead, he argues—again, without support—that "a video recording taken on a personal [cell phone] is not dependable and susceptible to being deleted or altered by the owner of the [cell phone]." Even assuming *arguendo* that is correct, Tinoco has failed to establish an interest created by the Constitution, a state law, or a state policy. Thus, he failed to demonstrate a legally cognizable liberty interest and or state a plausible claim for relief under the Fourteenth Amendment.

### 3. *Qualified Immunity*

Even if Tinoco plausibly stated a claim for relief under the Fourth and Fourteenth Amendments, qualified immunity nevertheless bars his claims.

---

[9] To be sure, the Code also states that "upon request[, the officer] shall show the warrant to the defendant as soon as possible." Tex. Code Crim. Proc. art. 15.26. Tinoco, however, does not allege that the officers prevented him from seeing his arrest warrant for an unnecessarily prolonged period of time. Instead, he merely argues—without support—that he was entitled to see his arrest warrant prior to his arrest.

15

Tinoco bears the burden of showing that qualified immunity is inappropriate. *Terwilliger*, 4 F.4th at 280. To discharge this burden, he must successfully allege that (1) an officer violated his federal right; and (2) the right was "clearly established" at the time of the alleged violation. *See Cole v. Carson*, 935 F.3d 444, 451 (5th Cir. 2019). As discussed above, Tinoco failed to allege a violation of his Fourth or Fourteenth Amendment rights.

Tinoco summarily alleges that his "constitutional rights" are clearly established. But that allegation is far too broad and generalized, as we must determine "whether the violative nature of particular conduct is clearly established." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). "[G]eneralizations and abstract propositions are not capable of clearly establishing the law." *Morgan v. Swanson*, 659 F.3d 359, 372 (5th Cir. 2011). Thus, we must evaluate the specific conduct that Tinoco alleges.

On his Fourth Amendment claim, Tinoco alleges that he was arrested based on a warrant affidavit that improperly relied on the testimony of Amaya. But he cites no cases—much less a controlling case or robust consensus of persuasive cases as our case law requires—showing that it is clearly established that an officer cannot rely on the testimony of a victim and direct witness to a crime to establish probable cause for an arrest. *See Morgan*, 659 F.3d at 372. Tinoco therefore does not show that a reasonable officer would understand the officers' conduct in this case to be a violation of a federal right. *See Thompson v. Upshur Cnty.*, 245 F.3d 447, 457 (5th Cir. 2001). Because Tinoco did not meet his burden to show a clearly established right, the officers are entitled to qualified immunity on his Fourth Amendment claim. *See Cole*, 935 F.3d at 451.

On his Fourteenth Amendment claim, Tinoco again argues that his due process liberty interests were violated because (1) he was not permitted to see his arrest warrant prior to arrest, and (2) his post-arrest interrogation

was recorded on a cell phone camera. And once again, he failed to cite a single case showing that he had a clearly established right to inspect his arrest warrant before his arrest or to have his post-arrest interrogation video recorded in a specific way. Because Tinoco has failed to show that these rights exist, he cannot show that they were clearly established. *See Fisher v. Moore*, 73 F.4th 367, 375 (5th Cir. 2023) ("[A] right never established cannot be one clearly established."). Because Tinoco did not meet his burden to demonstrate a clearly established right, the officers are entitled to qualified immunity from his Fourteenth Amendment claims. *See id.*

For these reasons, we hold that Tinoco has failed to state a plausible § 1983 claim under either the Fourth Amendment or the Fourteenth Amendment. And even if he could, qualified immunity would defeat his claims in this case. *See Cole*, 935 F.3d at 451.

### B. Tinoco's § 1983 Claims Against the City of Hidalgo, Mayor Coronado, and Chief Rodriguez

Tinoco further argues that the district court erred in dismissing his § 1983 claims against the City of Hidalgo, Mayor Coronado, and Chief Rodriguez. Again, we are unpersuaded. Tinoco does not allege facts that suggest that either Mayor Coronado or Chief Rodriguez was personally involved in his arrest and interrogation. He therefore fails to state a claim against them in their individual capacities. *See Burge v. Par. of St. Tammany*, 187 F.3d 452, 476–77 (5th Cir. 1999) ("[I]ndividual-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law."). Further, a claim against a municipal official in his official capacity is tantamount to a suit against the municipality. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 n.55 (1978). Thus, the district court did not err in dismissing Tinoco's claims against Mayor Coronado and Chief Rodriguez in their official capacities as "redundant" to his claim against the City of Hidalgo. *Sanders–Burns v. City of Plano*, 594 F.3d

366, 373 (2010) (noting that a plaintiff's § 1983 claims against a governmental entity "render[ed] any official capacity claim against [an employee of that entity] redundant"); *Guillot ex rel. T.A.G. v. Russell*, 59 F.4th 743, 751 (5th Cir. 2023) ("A claim against government officials in their official capacity is a de facto suit against the local government entity of which the officials act as agents.").

Turning to Tinoco's claims against the City of Hidalgo, he argues that it should be held liable for the constitutional violations that he alleges occurred in this case. But his argument fails to plead facts that would satisfy the elements of *Monell*. This court demands "a high standard of proof before imposing *Monell* liability on a municipality." *Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998). To survive a motion to dismiss, a plaintiff must plausibly allege "(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom)." *See Newbury v. City of Windcrest*, 991 F.3d 672, 680 (5th Cir. 2021) (internal quotation marks and citation omitted). For the purposes of § 1983, an official policy is a

> policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority. Alternatively, official policy is a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy.

*Sanders-Burns*, 594 F.3d at 381 (cleaned up) (citing *Brown v. Bryan Cnty.*, 219 F.3d 450, 457 (5th Cir. 2000)).

No. 23-40543

An unconstitutional policy renders a municipality liable under § 1983, and a facially innocuous policy can also support liability if it was promulgated with deliberate indifference to the "known or obvious consequences" that constitutional violations would result. *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001) (citing *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 407 (1997)). Section 1983 liability can arise for a failure to train police officers when "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). In failure to train cases, the plaintiff can prove the existence of a municipal custom or policy of deliberate indifference to individuals' rights in two ways:

> First, he can show that a municipality deliberately or consciously chose not to train its officers despite being on notice that its current training regimen had failed to prevent tortious conduct by its officers. *See Bryan County*, 520 U.S. at 405. Second, under the "single incident exception" a single violation of federal rights may be sufficient to prove deliberate indifference. *Id.* at 409. The single incident exception requires proof of the possibility of recurring situations that present an obvious potential for violation of constitutional rights and the need for additional or different police training. *See id.* We have consistently rejected application of the single incident exception and have noted that "proof of a single violent incident ordinarily is insufficient to hold a municipality liable for inadequate training." *Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998); *see also*, *Rodriguez v. Avita*, 871 F.2d 552, 554–55 (5th Cir. 1989).

*Gabriel v. City of Plano*, 202 F.3d 741, 745 (5th Cir. 2000).

Whatever method a plaintiff uses to establish an official policy, "there must be a direct causal link between the municipal policy and the constitutional deprivation" such that the policy is the "moving force"

behind the violation. *Piotrowski*, 237 F.3d at 580. Plaintiffs must meet a "high threshold of proof" in establishing this causal link, and in establishing "deliberate indifference," to prevent municipal liability from "collaps[ing] into *respondeat superior* liability." *See id.* (quoting *Snyder*, 142 F.3d at 796); *Bryan Cnty.*, 520 U.S. at 410 ("To prevent municipal liability for a hiring decision from collapsing into *respondeat superior* liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged.").

As discussed above, Tinoco failed to plead a violation of his constitutional rights. That error alone is fatal to his *Monell* claim as this court has emphasized "time and again that '[w]ithout an underlying constitutional violation, an essential element of municipal liability is missing.'" *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 866–67 (5th Cir. 2012) (citing *Becerra v. Asher*, 105 F.3d 1042, 1048 (5th Cir. 1997)).

Tinoco also fails to plead an official policy or custom. He argues that Officer Lozano has a persistent practice of violating citizens' constitutional rights, which includes: (1) arresting people without probable cause, (2) failing to give *Miranda* rights before an arrest, (3) continuing to interview people after they requested to have an attorney present, and (4) covering up cameras in interrogation rooms and recording interrogations on personal cell phones.[10] Even assuming that these allegations are true, they do not form an official policy. Tinoco's attempt to cobble together a policy from a handful of discrete, unrelated, actions taken by a single officer finds no basis in this circuit's jurisprudence. *See Sanders-Burns*, 594 F.3d at 381.

---

[10] Tinoco argues that both Officer Lozano and Officer Cantu recorded interrogations this way.

Tinoco also fails to demonstrate that the nebulous policy he alleges was the moving force for the specific constitutional violations that he purportedly endured. None of Tinoco's allegations regarding Officer Lozano's prior instances of unconstitutional conduct are connected to his alleged Fourth and Fourteenth Amendment violations in this case. Thus, even if Officer Lozano's prior acts could somehow generate a municipal policy, there would be no "direct causal link between the municipal policy and the constitutional deprivation" such that the policy was the "moving force" behind the violation. *See Piotrowski*, 237 F.3d 567, 580. This failure similarly dooms Tinoco's claims for municipal liability based on hiring, training, or supervision. Even if the City was inadequate in hiring, training, or supervising its officers—which Tinoco has not demonstrated—Tinoco fails to meet the "high threshold of proof" needed to show a "link between the policymaker's inadequate decision and the particular injury alleged." *Bryan Cnty.*, 520 U.S. at 410.

Tinoco's § 1983 claims for municipal liability essentially "collaps[e] into [claims for] *respondeat superior* liability" for Officer Lozano's actions. *Id.* While a handful of distinct prior alleged constitutional violations may indicate an unfortunate trend for a single officer, it fails to meet the "high standard of proof" required in this circuit to establish municipal liability. *See Snyder*, 142 F.3d at 796. Thus, we hold that the district court did not err in dismissing Tinoco's claims against the City of Hidalgo, Mayor Coronado, and Chief Rodriguez. *See id.*

### C. Tinoco's State Law Claims Against Amaya

The district court did not abuse its discretion in dismissing Tinoco's state law claims against Amaya. "A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." *Carlsbad Tech.*, *Inc. v. HIF*

*Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367). To that end, the general rule in this circuit is to dismiss state law claims if the federal law claims to which they are pendent are dismissed. *See Wong v. Stripling*, 881 F.2d 200, 204 (5th Cir. 1989) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)). In this case, Tinoco argues that the district court erred in dismissing his state law claims against Amaya because Amaya did not file a motion to dismiss and because the City did not request that the district court dismiss Tinoco's claims against Amaya. We reject this argument.

It is immaterial that defendants did not ask the district court to dismiss Tinoco's claims against Amaya. Once the district court determined that each of Tinoco's federal claims had failed, deciding whether to retain supplemental jurisdiction over Tinoco's state law claims against Amaya was purely discretionary. *See Carlsbad Tech.*, 556 U.S. at 639. The district court correctly determined that there was no compelling reason to retain jurisdiction over Tinoco's state law defamation and slander claims because it found that those claims do not overlap with Tinoco's federal claims. For this reason, we hold that, the district court did not abuse its discretion in declining to exercise § 1367 supplemental jurisdiction over Tinoco's state law claims after it dismissed his federal law claims. *See Wong*, 881 F.2d at 204.

### D. Tinoco's Request for Leave to Amend His Previously Amended Complaint

Finally, Tinoco argues that the district court erred in rejecting his request to amend his complaint for a second time. His argument is meritless. Rule 15(a) of the Federal Rules of Civil Procedure "requires a trial court to grant leave to amend freely, and the language of this rule evinces a bias in favor of granting leave to amend." *Jones v. Robinson Prop. Grp., LP*, 427 F.3d 987, 994 (5th Cir.2005) (internal quotation marks and citation omitted). However, Tinoco never filed a motion for leave to file a second amended complaint. Instead, Tinoco's request to file a second amended complaint was

a single boilerplate paragraph at the end of his response to the City's motion to dismiss stating that "if the [c]ourt finds Tinoco's First Amended Complaint does not set forth sufficient facts to state a claim for relief that is plausible on its face, Tinoco requests an opportunity to demonstrate to this [c]ourt that there are sufficient facts in this case to support his claims."

But we have held that such a bare statement is insufficient to constitute a request for leave to amend under Rule 15(a). *See Goldstein v. MCI WorldCom*, 340 F.3d 238, 254–55 (5th Cir. 2003) (holding that the district court did not abuse its discretion by denying plaintiffs' leave to amend where they "tacked on a general curative amendment request to the end of their response in opposition to the defendants' motion to dismiss" which stated that, "[s]hould this [c]ourt find that the Complaint is insufficient in any way . . . plaintiffs respectfully request leave to amend"); *U.S. ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 387 (5th Cir. 2003) ("[A] bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which the amendment is sought—does not constitute a motion within the contemplation of Rule 15(a)." (cleaned up)). Thus, Tinoco's terse paragraph is insufficient to constitute a request for leave to amend under Rule 15(a). We therefore hold that the district court did not err in implicitly rejecting Tinoco's perfunctory request to amend his complaint for a second time. *See Goldstein*, 340 F.3d at 254–55.

## IV.

For the foregoing reasons, we AFFIRM the district court's judgment.